FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  FEB 13 2020  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------X

LISA ADDONISIO

                        Plaintiff,

    -against-


ANDREW SAUL,[1]
Acting Commissioner of Social Security,

                        Defendant.

-----------------------------------X

**MEMORANDUM AND ORDER**
17-CV-1013 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff Lisa

Addonisio ("plaintiff") appeals the final decision of defendant

Andrew Saul, Commissioner of the Social Security Administration

("SSA") ("defendant" or the "Commissioner"), denying plaintiff's

application for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act ("the Act") on the grounds that

plaintiff is not disabled within the meaning of the Act.[2]

---

[1] Plaintiff commenced this action against Nancy A. Berryhill as the Acting
Commissioner of Social Security, and on June 17, 2019, Andrew M. Saul became
the Commissioner of Social Security. Because Nancy Berryhill was sued in
this action only in her official capacity, Andrew M. Saul is automatically
substituted for Nancy Berryhill as the named defendant. See Fed. R. Civ. P.
25(d). The Clerk of the Court shall amend the caption in this case as
indicated above.

[2] Individuals may seek judicial review in the United States district court for
the judicial district in which they reside, of any final decision of the
Commissioner of Social Security rendered after a hearing to which they were a

1

Plaintiff, represented by counsel, contends that she is disabled under the Act and is thus entitled to receive SSI benefits, due to severe, medically determinable physical and psychological impairments.

Presently before the court are defendant's motion for judgment on the pleadings. (ECF No. 10, Defendant's Motion for Judgment on the Pleadings; ECF No. 11, Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (together, "Defendant's Motion")), and plaintiff's opposition to defendant's motion for judgment on the pleadings and plaintiff's cross-motion for judgment on the pleadings, (ECF No. 12, Plaintiff's Notice of Cross-Motion for Judgment on the Pleadings; ECF No. 13, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings (together, "Plaintiff's Cross-Motion")).

## BACKGROUND

The factual and procedural background leading to this action is set forth in the administrative record. (ECF No. 14, Administrative Record ("Tr.").) The court has reviewed the parties' respective motions for judgment on the pleadings and

---

party, within sixty days after notice of such decision or within such further time as the Commissioner may allow. *See* 42 U.S.C. § 405(g).

the administrative record. The court discusses only those facts relevant to its determination, as set forth herein.

## I. Procedural History

Plaintiff applied for SSI on April 29, 2013, alleging that she became disabled on December 1, 2006, due to panic attacks, depression, lethargy, an inability to focus and concentrate, head and neck pains, and anxiety, both social and otherwise. (Tr. 115-23, 134, 138.)

The Social Security Administration (the "SSA") initially denied plaintiff's application on October 29, 2013, based on its finding that plaintiff was not disabled within the meaning of the Act. (Tr. 67-72.)

In response, plaintiff requested an administrative hearing before an Administrative Law Judge on January 7, 2014 ("ALJ"). (Tr. 73-75.) Plaintiff appeared with her attorney at a hearing on December 3, 2015, and testified before ALJ Laura Michalec Olszewski ("ALJ Olszewski" or "the ALJ"). (Tr. 37-57.) In addition to plaintiff's testimony, ALJ Olszewski also reviewed the testimonial interrogatory responses of Marian Marracco, a vocational expert ("VE"), which were submitted on March 18, 2016. (TR. 195-200.) On May 4, 2016, ALJ Olszewski issued an Unfavorable Decision denying plaintiff's claim for DIB, based on her finding that plaintiff was not disabled within the meaning of the Act. (Tr. 7-19 (the "ALJ Decision").)

3

In a letter dated June 21, 2016, plaintiff appealed the ALJ Decision to the Appeals Council. (Tr. 31-32.) On January 18, 2017, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the Commissioner's final determination. (Tr. 1-5.) Thus, the relevant period for disability determination is from April 29, 2013[3] through May 4, 2016, the date of the ALJ Decision. (Tr. 7-19.)

Plaintiff commenced the instant action on February 23, 2017. (*See* ECF No. 1, Complaint filed 2/23/2017). The Commissioner filed her motion for judgment on the pleadings on December 14, 2017, requesting that the court affirm the ALJ's final decision and dismiss this action. Presently before the court are Defendant's Motion for Judgment on the Pleadings (ECF No. 10) and Plaintiff's Cross-Motion for Judgment on the Pleadings (ECF No. 12).

## II. Personal, Employment, and Non-Medical Facts

Plaintiff was born on April 15, 1980. (Tr. 134.) Plaintiff is 4'11" tall and weighs 105 pounds. (Tr. 138.) Plaintiff is fluent in English. (Tr. 137.) Plaintiff's highest level of school was 11th grade, which she completed in June 1997, and she received her general education degree. (Tr. 44, 139.) At plaintiff's ALJ hearing on December 3, 2015, plaintiff stated

---

[3] Defendant asserts that "In general, SSI benefits are not payable any earlier than the month after the month in which the SSI claim was filed. 42 U.S.C. § 1382(c)(7); see 20 C.F.R § 416.335."

that she was legally married, but had been separated from her husband for nearly four years. (Tr. 45.) Plaintiff further stated that she had two children, then aged 13 and 19, with her separated husband, and that he had full custody. (*Id.*) Plaintiff stated that she had no past work experience, was supported financially by her parents and grandmother, and was on Medicaid. (Tr. 45-47.) Plaintiff stated that, at the time, she was living in a house and splitting the rent with her retired fiancé, who drove her to hearing and would drive her to all of her medical appointments. (Tr. 46.)

Plaintiff testified that, on a typical day, she slept between 12 and 14 hours, prepared something to eat upon waking up, occasionally watched television, and spent most of her time lying down on the couch or in bed. (Tr. 47.) Further, after three or four hours, she became sleepy due to her medication and would sleep for an additional two to three hours. (*Id.*) Plaintiff stated that had been with her fiancé for three years, having been introduced through a mutual friend, and he prepared all of her meals and took care of the household chores. (Tr. 48.) Plaintiff denied using social media, going shopping, going to the movies, having fun, or having friends beyond her fiancé and the mutual acquaintance that introduced them. (Tr. 48-49.) Plaintiff stated that she had a phone, but only used it to stay in contact with her children. (Tr. 49.)

Plaintiff stated that she could not work due to anxiety, depression, neck pain, back pain, headaches, migraines, and fatigue due to difficulty staying asleep because of pain. (Tr. 50.) Plaintiff stated that she began seeking mental health treatment in April 2014; however, there was a reported gap in treatment, between June 2014 and March 2015, due to plaintiff experiencing mental symptoms. (Tr. 50-51.) Plaintiff asserted that the mental health treatment was not helping her, but she was still going in addition to taking Effexor, which she had been prescribed since 2008. (Tr. 51.) Plaintiff also stated that she had been receiving monthly steroid injections for her neck and back since 2013, with the pain originating around 2007 or 2008. (Tr. 52.) In addition to the steroid injections, plaintiff stated that she had been prescribed Oxycodone since 2014, took four to five 20-milligram pills per day, which made her tired, and that the medication "lessens the pain[,] but it never fully goes away." (Tr. 53-54.) Plaintiff stated that her doctor recommended that she consult a neck surgeon; however, plaintiff did not feel comfortable getting surgery, and she never met with a neck surgeon. (Tr. 53.)

### III. Medical Facts

The Administrative Record includes plaintiff's medical records dating back to September 2012. (Tr. 189-347.)

**1. Medical Evidence Prior to the April 29, 2013, Application Date**

6

## A. 9/7/12 Report by Nadia Alawi-Kakomanolis, M.D

On September 7, 2012, plaintiff went to the Maimonides
Medical Center ("Maimonides") complaining of anxiety and saw
Nadia Alawi-Kakomanolis, M.D. (Tr. 224-27.) Dr. Alawi-
Kakomanolis noted that plaintiff's anxiety was well-controlled
by her medications. (Tr. 224.) Plaintiff stated that she had
recently broken up with her significant other, with whom she
lived at the time, had marital and family problems, and was
stressed. (Id.) Plaintiff smoked cigarettes daily and denied
using alcohol or drugs. (Id.) Plaintiff denied malaise, sleep
disturbance, or any physical problems, including neck or joint
pain. (Tr. 225.) On examination, Dr. Alawi-Kakomanolis noted
that plaintiff: appeared oriented to time, place, and person and
normally groomed; had no neurological defects, including normal
balance, cognitive functioning, gait, stance, and reflexes; and
had an euthymic mood, normal affect, and unimpaired thought
processes and content. (Tr. 225-26.) Plaintiff was diagnosed
with anxiety disorder not otherwise specified ("NOS"),
prescribed Alphrazolam (Xanax, a sedative) and Venlafaxine
(Effexor, an antidepressant), and advised of therapy options.
(Tr. 226.)

## B. 10/10/12 Report by Dimitry Bosoy, M.D.

Plaintiff went to the Maimonides emergency department on October 10, 2012, complaining of a fever and chills that lasted for one week as well as abdominal pain. (Tr. 233-39.) Plaintiff did not endorse having malaise, sleep disturbance, or neck, joint or back pain. (Tr. 236.) On examination, plaintiff did not appear to be in apparent distress, had normal range of motion ("ROM") in both of her arms and legs, and had no neurological deficits. (*Id.*) Plaintiff was diagnosed with pelvic inflammatory disease, given antibiotics, and discharged that same day. (Tr. 237-39.)

### C. 1/4/13 Report by Martha Anthony, M.D.

Plaintiff went to the Maimonides emergency department on January 4, 2013, seeking treatment for a rash that had lasted for two weeks, which was identified as caused by ringworm. (Tr. 213-16.) Plaintiff denied having other physical problems, including neck or joint pain, sleep disturbance, or malaise. (Tr. 213-14.) Plaintiff also denied having symptoms of anxiety or depression. (Tr. 214.)

## 2. Medical Evidence Following the April 29, 2013, Application Date

### A. 4/30/13 Report by Annie Wong, FNP

On April 30, 2013, plaintiff returned to Maimonides for anxiety treatment. (Tr. 209-12.) At the time, plaintiff reported that she was on Venlafaxine for depression. (Tr. 209.)

8

Plaintiff reported that she smoked cigarettes daily and denied using alcohol or drugs. (Tr. 209-10.) Plaintiff denied having other physical problems, including neck or joint pain, sleep disturbance, or malaise. (Tr. 210.) On examination, Nurse Wong noted that plaintiff: appeared oriented to time, place, and person and normally groomed; had no neurological defects, including normal balance, cognitive functioning, gait, stance, and reflexes; and had an euthymic mood, normal affect, and unimpaired thought processes and content. (Tr. 211.) Plaintiff was diagnosed with nicotine dependence, anxiety disorder NOS, and body dysmorphic disorder ("BDD"). (*Id.*) Plaintiff was counseled on smoking cessation, recommended to a smoking cessation clinic, and given a 30-day prescription of Alprazolam (Xanax) with no refills. (Tr. 211-12.)

### B. 7/26/13 Report by Nancy Camp, M.D.

Plaintiff went to the Maimonides emergency department on July 26, 2013, complaining of a panic attack she had at her sister's home that lasted for three hours. (Tr. 241-45.) Plaintiff reported that she was being evicted from her apartment, just had a divorce, and lost custody of her children. (Tr. 241, 243.) Plaintiff denied any pain or headaches, but reported having chest pain, palpitations, feeling anxious, and being under a lot of stress. (Tr. 242-43.) At the time,

plaintiff was on Effexor and Xanax, but believed that it was not enough. (Tr. 243.)

On examination, Dr. Camp found that plaintiff appeared well and in no apparent distress; had normal cardiovascular, respiratory, and neurological functioning; and had normal ROM in both of her arms and legs. (Tr. 243-44.) Plaintiff was diagnosed with anxiety-panic attack and discharged that day with instructions to contact her usual healthcare provider as soon as possible to arrange appropriate follow-up care. (Tr. 244.)

### C. 8/21/13 Report by Ashley Knoll, Psy.D.

Plaintiff saw Ashley Knoll, Psy.D., for a consultative psychiatric evaluation on August 21, 2013. (Tr. 247-51.) Plaintiff's friend drove her to the appointment. (Tr. 247.) At the time, plaintiff reported that she had been separated from her husband for a year and a half, had been evicted, and was currently staying at a friend's apartment. (*Id.*) Plaintiff reported having two children, aged 10 and 16, who lived with her husband. (*Id.*) Plaintiff had a general education degree but was not, and had never been, employed. (*Id.*) Plaintiff denied any history of psychiatric treatment or current treatment, but reported meeting with a psychiatrist once and not feeling able to return because "it was 'hard to talk about her problems.'" (*Id.*) Plaintiff also denied having suicidal or homicidal thoughts, visual or auditory hallucinations, or a history of

drug and alcohol use or abuse. (Tr. 248.) Plaintiff denied

having any current legal problems, but stated that she purposely

missed custody arraignments because she believed her children

would be better suited living with their father. (*Id.*)

Plaintiff reported that she had a history of BDD,

depression, symptoms of anxiety and depression, and panic

attacks, which started about five years before her August 2013

evaluation. (Tr. 247.) Plaintiff further stated that she

recently had a panic attack that led to an emergency room visit.

(*Id.*) Plaintiff reported that her symptoms included never

feeling rested, hypersomnia, loss of appetite, and depressive

symptoms, which included crying spells, anhedonia, social

withdrawal, problems concentrating, fatigue, and irritability.

(Tr. 248.) Plaintiff also reported having excessive anxiety and

panic attacks twice a day. (*Id.*) At the time, plaintiff

reported that she was taking Effexor, Xanax, Meloxicam (an anti-

inflammatory medication), and Baclofen (a muscle relaxant)

daily. (Tr. 247.) Plaintiff stated that could: bathe, dress,

and groom herself over a four-hour period; cook and prepare her

own food, but rarely did so due to her depressed mood and

hypersomnia; do her own laundry, but chose to send it out; and

manage her own money. (Tr. 250.) Plaintiff stated that she did

not do her own shopping because she felt unable to leave her

apartment at times, did not drive or take public transportation

due to panic symptoms, and was socially withdrawn. (*Id.*)
Plaintiff also reported that she enjoyed listening to the radio,
but spent most of her days sleeping. (*Id.*)

During examination, Dr. Knoll observed that plaintiff
related adequately and was cooperative, yet irritable. (Tr.
248.) Further, Dr. Knoll observed that plaintiff dressed
appropriately and was well-groomed, but noted that plaintiff was
slouched in her chair and wore sunglasses due to light
sensitivity. (Tr. 248-49.) Dr. Knoll also observed that
plaintiff's speech was fluent and clear, and that she had
adequate, expressive, and receptive language skills. (Tr. 249.)
Dr. Knoll noted that plaintiff had clear senses, coherent and
goal-directed thought processes with no evidence of
hallucinations, delusions, or paranoia, and was oriented to
person, place, and time. (*Id.*) Dr. Knoll noted that Plaintiff
had a depressed and irritable affect, dysthymic mood, and intact
attention and concentration due to her symptomatology. (*Id.*)
Dr. Knoll also noted that plaintiff had mildly impaired recent
and remote memory skills due to anxiety or nervousness. (*Id.*)
Dr. Knoll noted that plaintiff had average intellectual
functioning, appropriate fund of information, and fair insight,
but poor judgment. (*Id.*) Dr. Knoll opined that plaintiff could
follow and understand simple directions and instructions, and
could perform simple tasks independently. (Tr. 250.) Further,

12

Dr. Knoll opined that plaintiff had mild limitations maintaining attention and concentration and performing complex tasks independently; moderate limitations in maintaining a regular schedule and making appropriate decisions; and marked limitations in adequately relating to others and appropriately dealing with stress. (*Id.*)

Dr. Knoll opined that the results of the examination were consistent with psychiatric problems, and that this might significantly interfere with plaintiff's ability to function on a daily basis. (*Id.*) Dr. Knoll diagnosed plaintiff with major depressive disorder, panic disorder with agoraphobia, and Body Dysmoprhic Disorder. (Tr. 250.) Dr. Knoll recommended that plaintiff engage in individual psychological therapy and a psychiatric intervention of medication. (251.) Further, Dr. Knoll recommended that plaintiff receive medical follow-up for her neck and back pain. (*Id.*)

### D. 9/8/13 Report by Stephen Roberts, M.D.

Plaintiff saw consultative physician Stephen Roberts, M.D., for an internal medicine examination on September 8, 2013. (Tr. 252-57.) At the time of the examination Dr. Roberts had not sent plaintiff for X-Rays or any other diagnostic testing nor had he reviewed any prior diagnostic tests. (*Id.*) Plaintiff was referred by the Division of Disability Determination and was

examined with a chaperone present for the examination. (Tr. 253.)

Plaintiff's chief complaints were neck and back pain with occasional tingling in her arms over the past five years, though plaintiff did not experience the tingling on the day of the examination. (*Id.*) Plaintiff described her pain as being sharp, intermittent, and between 7-9 on a pain scale (0 being no pain, 10 being the worst possible). (*Id.*) Plaintiff additionally complained of having a rash off and on for the previous year, which she believed to be an allergic in nature, and of having weekly migraine headaches with no nausea or vision changes. (*Id.*) Plaintiff related a history of BDD, anxiety, depression, panic attacks, constant fatigue, and difficulty sleeping. (*Id.*) Plaintiff mentioned the panic attack-related hospitalization from 2013, but did not indicate any other physical health related hospitalizations. (*Id.*) Plaintiff denied a history of high blood pressure, diabetes, heart attack or other heart disease, asthma, emphysema, or seizures. (*Id.*) Plaintiff reported that she was a cigarette smoker, smoking a half pack daily since 2007, but denied any other alcohol or drug use. (Tr. 254.)

Additionally, plaintiff reported that her daily activities included self-care (showering, bathing, and dressing herself), watching television, and listening to the radio.

14

(*Id.*)  Plaintiff reported that she did not cook, clean, do laundry, or shop due to symptoms of fatigue, loss of interest, depression, and social anxiety.  (*Id.*)

Upon examination, Dr. Roberts noted that plaintiff: appeared to be in no acute distress; had a normal gait and stance; could walk on heels and toes without difficultly; could fully squat; needed no help getting on and of the exam table; and was able to rise from the chair without difficulty.  (*Id.*) Dr. Roberts noted that plaintiff had muscular tenderness in the cervical muscular region; some reduced ROM in her cervical and lumbar spine and spasms along her cervical spine; full ROM in her shoulders, elbows, forearms, wrists, hips, knees, and ankles; joint stability and no tenderness; no redness, heat, swelling, or effusion; no sensory deficits; and normal strength in both of her hands, arms, and legs.  (Tr. 255-56.)  Dr. Roberts diagnosed plaintiff with BDD, depression, anxiety, neck and back pain, headaches by history, chronic fatigue, problem sleeping, and cervical and lumbar pain.  (Tr. 256.)  Dr. Roberts opined that, on the basis of his examination and interview, plaintiff had "moderate limitations with prolonged standing, lifting and carrying heavy weight."  (*Id.*)

### E. 12/4/13 MRI Report by Harold Parnes, M.D.

An MRI of plaintiff's cervical spine was performed on December 4, 2013.  (Tr. 261-63.)  The MRI revealed straightening

15

as well as reversal of the lumbar curvature of the cervical spine as noted on the sagittal images, and intact "visualized neural components." (Tr. 262.) Further, the MRI revealed that there was: mild-to-moderate narrowing at the C5 through C7 levels, which demonstrated ventral impingement; small posterior osteophytes and posterocentral disc herniations at the C4 through C7 levels, which demonstrated ventral impingement on the thecal sac[4], cervical cord, and intervertebral foramina bilaterally at the C5-C6 level; and a posterior bulging disc at the C3-C4 level. (Tr. 263.)

### F. 12/16/13 Report by Lajos Lamperth, M.D.

On December 16, 2013, plaintiff presented to pain management specialist Lajos Lamperth, M.D., at USA Pain, for an initial consultation. (Tr. 345-47.) Plaintiff was referred by her primary care physician Ranga Krishna, M.D. (Tr. 345.)

Plaintiff complained of chronic right neck pain, headaches, numbness in her arms and hands, and severe lower back pain of five years. (Id.) Plaintiff reported that her pain was 10 out of 10 on the day of the examination; her tolerable pain was 3 out of 10; her pain was never controlled; she could only sit for one hour and stand for one hour due to her pain; and she

---

[4] The thecal sac is a membrane that surrounds the spinal cord and spinal nerves. It is filled with cerebral spinal fluid and acts as a protective barrier for sensitive nerve tissue. W. A. Newman Dorland, *Dorland's Illustrated Medical Dictionary* (2007).

could only walk ten city blocks without feeling discomfort. (*Id.*) Plaintiff reported that her pain was aggravated by sitting, standing, lying down, and walking. (*Id.*) Plaintiff denied headaches or migraines associated with pain. (*Id.*) Plaintiff reported smoking cigarettes daily, refused to discuss her alcohol usage, and denied drug use. (Tr. 346.) Plaintiff reported that she was taking Xanax and Effexor, but was not taking any pain medication at that time. (*Id.*)

Upon examination, Dr. Lamperth reported that plaintiff had: no spinal tenderness; limited ROM in her neck due to pain; normal strength, neurological, motor, and sensory functioning in her arms and legs; and no gait abnormalities. (*Id.*) Dr. Lamperth's physical diagnoses included shoulder, elbow, neck, cervical, and lower back pain; cervical and lumbar radiculopathy; shoulder region affection; muscle spasms; sleep disturbance; myalgia and myositis; limb pain; and headaches. (Tr. 347.) Dr. Lamperth discussed the risks and benefits of steroid injections, started plaintiff on Ambien (a sedative), Soma (a muscle relaxer), Ultram (a narcotic for pain), and Percocet (a narcotic for pain), prescribed a lower back and knee brace(s), and recommended a follow-up appointment in one month. (*Id.*)

### G. 2014-2015 Counseling and Therapy Reports

Plaintiff attended numerous counseling and therapy sessions at Revived Soul Medical P.C. (Revived Soul) between April 7, 2014, and October 19, 2015. (Tr. 267-315.)

### 1) 4/7/2014 Report by Alla Chrome, LMSW

On April 7, 2014, Alla Chrome, a social worker, performed an intake evaluation. (Tr. 313.) At this time, plaintiff was still separated from her husband, lived with her partner, and received public assistance. (Tr. 314.) Plaintiff's chief complaint was BDD "since childhood," which she claimed was at its worst in 2006, when she weighed 88 pounds. (Tr. 313.) Plaintiff stated that Effexor "helped somewhat but BBD [was] still there." (*Id.*) Plaintiff also complained of panic attack symptomology when anxious, including a sense of loss of control, a fear of dying, shortness of breath, chest pain, increased heart rate, cold hands, paresthesias, and other symptoms of "autonomic instability." (*Id.*) Plaintiff felt confused and embarrassed when stressed and that her surroundings were not real. Plaintiff further endorsed hypervigilance, irritability, obsessive-compulsive symptoms, and depressive disorder symptoms without suicidal thoughts, including loss of appetite, fatigue, sadness, increased worry, and decreased sociability. (*Id.*) Ms. Chrome noted that plaintiff was on Effexor and Xanax at the time and had been to the emergency department for a panic attack. (Tr. 314.)

Plaintiff's diagnoses were anxiety disorder due to another medical condition and BDD, and Ms. Chrome assigned plaintiff a Global Assessment of Functioning ("GAF") score[5] of 60. (*Id.*) Ms. Chrome referred plaintiff to an eating disorder program. (Tr. 315.)

### 2) 4/9/2014 Report by Marlene Charles, M.D.

On April 9, 2014, plaintiff saw psychiatrist Marlene Charles, M.D., of Revived Soul for a psychiatric intake evaluation. (Tr. 309–12.) Plaintiff's chief complaint was attention deficit disorder (ADD), anxiety and depression, and an eating disorder since her twenties. (Tr. 309.) Plaintiff reported emotional abuse from her husband of 17 years and that she was in the process of a divorce. (*Id.*) Plaintiff reported her symptoms as having less energy, experiencing angry outbursts, loss of enjoyment, depression, irritability, sadness, difficulty sleeping, and increased worry. (*Id.*) Plaintiff denied manic symptoms, hallucinations, delusion, or other symptoms of a psychotic process. (*Id.*) Plaintiff also denied

---

[5] The GAF scale is used to rate the seriousness of a plaintiff's mental illness and how much a plaintiff's symptoms affect his or her daily life on a scale of 1 to 100, with 1 being the lowest possible level of functioning. WebMD, *What Is the Global Assessment of Functioning (GAF) Scale?*, https://www.webmd.com/mental-health/gaf-scale-facts. As courts within this district have noted, the Administration has cautioned against relying on GAF to evaluate disability because "there is no way to standardize measurement and evaluation." The Administration has also instructed ALJs to "treat GAF scores as opinion evidence" and that "the details of the clinician's description, rather than a numerical range, should be used." *See, e.g.*, *Mainella v. Colvin*, No. 13-CV-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014).

any musculo-skeletal problems, including recent falls, stiffness, weakness, or joint pain, and reported no other recent pain, headaches, neck, skin, or neurological problems. (Tr. 309-310.) Plaintiff stated that she could not see her children as much as she would like to due to her husband. She reported speaking to her mother on the phone regularly, did not see or talk to other family members much, and was living with her boyfriend. (Tr. 310.)

Upon examination, Dr. Charles noted that plaintiff appeared sad, wary, casually groomed, anxious, and tense. (*Id.*) Dr. Charles further noted that plaintiff exhibited normal, coherent, and spontaneous speech. (*Id.*) Dr. Charles noted that plaintiff had signs of depression, convincingly denied suicidal and homicidal thoughts, and there were no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. (*Id.*) Dr. Charles also noted that plaintiff had normal and intact cognitive function; intact memory; intact and age-appropriate fund of knowledge; full orientation; normal vocabulary; fair insight and social judgment; and no signs of hyperactive or attentional difficulties. (Tr. 310-311.) Further, Dr. Charles noted that plaintiff demonstrated signs of anxiety, appropriate behavior, and was cooperative and attentive with no gross behavioral anomalies. (Tr. 311.) Dr. Charles maintained Ms. Chrome's

20

assessments, referred plaintiff for therapy, refilled
plaintiff's Effexor prescription, and recommended a follow-up
visit in two to four weeks. (*Id.*)

### 3) 4/23/2014 Report by Marlene Charles, M.D.

Plaintiff saw Dr. Charles again two weeks later, on
April 23, 2014, and Dr. Charles mostly maintained her findings.
(*Compare* Tr. 307-08 *with* Tr. 310-11.) Plaintiff reported that
she was feeling very anxious, not doing too well, and she was
prescribed Xanax that was not helping her anxiety. (Tr. 307.)
Dr. Charles noted that plaintiff showed a partial treatment
response, but her feelings of anxiety, irritability, fear, and
apprehension were unchanged. (*Id.*) Dr. Charles maintained her
earlier assessments and recommended a follow-up visit in two to
four weeks. (Tr. 308.)

### 4) 5/7/2014 Report by Marlene Charles, M.D.

Plaintiff saw Dr. Charles again two weeks later, on
May 7, 2014, and Dr. Charles mostly maintained her findings,
except she did note that plaintiff exhibited signs of mild
depression. (*Compare* Tr. 304-05 *with* Tr. 307-08.) Dr. Charles
refilled Plaintiff's Effexor and Xanax, and recommended a
follow-up visit in three to four weeks. (Tr. 305.)

### 5) 6/4/2014 Report by Marlene Charles, M.D.

Plaintiff saw Dr. Charles for a follow-up visit on
June 4, 2014. (Tr. 301-303.) Plaintiff reported feeling

overwhelmed, anxious, and worrying about her children living with their father. (Tr. 301.) Dr. Charles noted that plaintiff had a "partial response to treatment," but plaintiff reported that her anxiety, hypervigilance, irritability, and energy remained unchanged. (*Id.*) Dr. Charles further indicated that plaintiff had taken her medication regularly with no reported or notable side effect, and that Plaintiff's behavior was stable and unremarkable. (*Id.*) Dr. Charles otherwise maintained her findings from plaintiff's prior visit, but noted that plaintiff appeared tense, and recommended a follow-up visit in two to four weeks. (*Compare* Tr. 301-02 *with* Tr. 304-05.)

### 6) 6/30/2014 Report by Avraam Pipko, PA

Plaintiff returned for a follow-up visit on June 30, 2014 with Avraam Pipko, a physician's assistant. (Tr. 298-300.) PA Pipko noted that plaintiff had a "partial response to treatment," but plaintiff's anxiety symptoms continued. (Tr. 298.) PA Pipko otherwise maintained Dr. Charles' findings, refilled plaintiff's Effexor prescription, recommended therapy, and recommended a follow-up visit in four weeks to re-evaluate plaintiff's medications. (Tr. 299.)

### 7) 3/26/2015 Report by Marlene Charles, M.D.

After an apparent gap in treatment, plaintiff saw Dr. Charles again on March 26, 2015. (Tr. 295-97.) Plaintiff reported that her mood had improved, but that she still felt

22

anxious at times. (Tr. 295.) Dr. Charles indicated that plaintiff had a partial response to treatment, but that her feelings of anxiety and apprehension symptomology were unchanged and plaintiff's behavior had been stable. (Id.) Plaintiff denied symptoms of depression. (Id.) Upon examination, Dr. Charles noted that plaintiff "ha[d] no apparent serious mental status abnormalities," neither depression nor mood elevation was evident, and there were no apparent signs of anxiety. (Id.) Plaintiff was diagnosed with BDD at this visit, and was again assigned a GAF score of 60. (Compare Tr. 295 with Tr. 301.) Dr. Charles refilled Plaintiff's Effexor prescription, prescribed Klonopin (a sedative), and recommended a follow-up visit in three to four weeks. (Tr. 296.)

### 8) 4/7/2015 Report Lajos Lamperth, M.D.

Plaintiff returned to Dr. Lamperth at USA Pain on April 7, 2015, for follow-up visit regarding her pain. (Tr. 342-44.) Plaintiff reported 10 out of 10 pain in her knees and lower back that was worse than previous months. (Tr. 342.) Plaintiff stated that her medication helped with activities of daily living, but her knees gave out when she walked, and that she was unable to lift, pull, push, stretch, bend, or move anything over five pounds, or sit or stand for greater than 20 minute intervals. (Id.) Dr. Lamperth's findings and diagnoses

remained unchanged from his initial consultation. (*Compare* Tr. 342-44 *with* Tr. 345-47.)

### 9) 4/23/2015 Report and Medical Questionnaire by Marlene Charles, M.D.

Plaintiff saw Dr. Charles for a follow-up visit on April 23, 2015. (Tr. 279-81.) Plaintiff reported that she was not doing well and feeling depressed and anxious about not being able to see her children. (Tr. 279.) Plaintiff also brought an SSI form to be completed. (*Id.*) Dr. Charles noted that plaintiff was partially improved, but that her feelings of anxiety, apprehension, loss of control, and sadness were unchanged. (*Id.*) Further, the frequency of plaintiff's episodes of hypervigilance, uncomfortable sensations of excessive motor tension, anxiety-related sleep disturbance, anxiety, and excessive worrying were unchanged. (*Id.*) Dr. Charles' otherwise maintained her assessments. (*Compare* Tr. 279 *with* Tr. 292.)

In a medical questionnaire dated the same day (Tr. 264-66), Dr. Charles listed plaintiff's mental diagnoses as general anxiety disorder and depression. (Tr. 264.) Despite indicating plaintiff's GAF as 60 in her other report, Dr. Charles indicated that plaintiff's GAF score was 40, and plaintiff's highest GAF score in the past year was 45. (*Id.*) Dr. Charles found that plaintiff had mild limitations in two out

of three areas for understanding and memory, and marked limitations in the remaining one; moderate limitations in one of four areas for sustained concentration and persistence, and marked limitations in the remaining three; and mild limitation in one out of five of the reviewable areas for adaptation,[6] moderate limitations in one, and marked limitations the remaining two areas. (Tr. 265-66.) Dr. Charles noted that plaintiff's impairment would interfere with her ability to work at least 20% of the time, and that she would miss at 15 days of work per month. (Tr. 266.) Dr. Charles believed that plaintiff's prognosis was fair with good support system and treatment, and that she would be capable of managing funds. (Tr. 264, 266.) Dr. Charles reported that plaintiff could not work on a regular and sustained basis in light of her mental impairment, due to her poor concentration, mistrust of her environment and others, anxiety, depression, panic attacks, low frustration tolerance, and fear of crowded places. (Tr. 266.)

### 10) Reports Between May 2015 and October 2015 by Lajos Lamperth, M.D.

Plaintiff continued pain management treatment with Dr. Lamperth on an approximately monthly basis between May and October 2015. (Tr. 320-341.) Plaintiff's complaints, and Dr.

---

[6] The questionnaire appears to be missing one functional area for adaptation, as it lists the other four as "b." through "e." (Tr. 266.)

Lamperth's findings and recommendations, remained largely consistent with those from the initial consultation, dated December 16, 2013. (*Compare* Tr. 322-23, 325-26, 330-31, 333-34, 340-41 *with* Tr. 342-44, 345-47.) Oxycodone, a narcotic for pain, was added to plaintiff's treatment regimen in place of Percocet. (*Compare* Tr. 331 *with* Tr. 337.) Dr. Lamperth administered several sacroiliac and knee trigger point injections, which plaintiff tolerated well. (Tr. 320, 327, 328, 338.) On October 15, 2015, plaintiff reported that she "did very well" after the last injection on October 13, 2015. (Tr. 320-321.)

### 11) 9/14/2015 Report by Marlene Charles, M.D.

Plaintiff saw Dr. Charles for a follow-up visit on September 14, 2015. (Tr. 276-78.) Dr. Charles noted that plaintiff was last seen on April 23, 2015. (Tr. 276.) Plaintiff reported that she had not been doing well, was feeling anxious, and had not been leaving her apartment for months. (*Id.*) Dr. Charles noted that plaintiff was partially improved, but her anxiety symptoms, feelings of apprehension, avoidance of certain anxiety-evoking situations, episodes of hypervigilance and irritability, excessive worrying, and sadness were all unchanged. (*Id.*) Dr. Charles maintained her other observations and assessments. (*Compare* Tr. 279-80 *with* Tr. 276-77.)

26

### 12) 9/28/2015 Report by Alla Chrome, LMSW

On September 28, 2015, plaintiff saw Ms. Chrome again and reported no change in her symptoms. (Tr. 274-75.) Ms. Chrome noted that plaintiff was "performing normally at work," and that self-care and domestic skills were intact. (Tr. 274.) Ms. Chrome also noted that plaintiff was socially isolated, erratic with her medication compliance, had some angry outbursts, continued to have impulsive behaviors, and was almost always confused. (*Id.*) Ms. Chrome assessed plaintiff with BDD and assigned a GAF score of 60. (*Id.*)

### 13) 10/12/15 and 10/19/15 Reports by Alla Chrome, LMSW

On October 12, 2015, plaintiff saw Ms. Chrome, who noted that plaintiff seemed worse. (Tr. 269.) Plaintiff reported compliance with medication, performing normally at work, socializing less with family and friends, and a decrease in impulsive behavior. (*Id.*) Ms. Chrome noted reduced self-care, angry outbursts, anxiety, and confusion. (*Id.*) Ms. Chrome made no changes to Plaintiff's diagnosis and maintained Plaintiff's GAF score of 60. (*Compare* Tr. 269 *with* Tr. 274.) On October 19, 2015, plaintiff saw Ms. Chrome again who noted that plaintiff "has had no apparent response to treatment yet." (Tr. 267.) Ms. Chrome's otherwise maintained her observations and assessments. (*Compare* Tr. 267 *with* Tr. 269.)

**14) 11/10/2015 Functional Capacity Evaluation by Ranga Krishna, M.D.**

Plaintiff saw Dr. Krishna for a "functional capacity evaluation" on November 10, 2015. (Tr. 316-19.) Plaintiff complained of chronic neck and lower back pain, which had worsened since 2008, headaches, and numbness and tingling in both of her hands and wrists. (Tr. 316.) Plaintiff reported that her back and neck pain was 8 out of 10. (Tr. 317.) Plaintiff stated that she was taking Oxycodone and Fioricet (an analgesic). (Tr. 316.) Plaintiff stated that she lived with her fiancé, mostly stayed home to rest, sometimes went out for medical appointments and short walks, and did not participate in any recreational activities. (Tr. 316-17.) Plaintiff stated that her daily activities included independent bathing, grooming, dressing, and self-care, which she performed slowly and cautiously. (Tr. 316.) Plaintiff further stated that her fiancé would assist with cleaning, cooking, laundry, and grocery shopping. (Tr. 317.)

Dr. Krishna observed that plaintiff exhibited smooth and coordinated movement throughout the evaluation. (Tr. 317.) Dr. Krishna found that, in terms of significant abilities, plaintiff had normal coordination in her arms; normal grip strength; the ability to stand for about 20 minutes; the ability to lift about five pounds; and the limited ability to squat.

(*Id.*)  Dr. Krishna found that, in terms of significant deficits, plaintiff ha increased lower back pain and trunk instability with strong efforts; decreased ROM in her cervical and lumbar spine; loss of balance with strong efforts; decreased tolerance for sitting for about 20 minutes; the inability to lift more than five pounds; and the inability to crawl or kneel.  (*Id.*)  Dr. Krishna concluded that plaintiff could perform "Less Than Sedentary Work" according to the 2012/2013 Worker's Compensation guidelines.  (Tr. 318.)  Dr. Krishna also concluded that plaintiff demonstrated additional rehabilitation potential to increase her functional abilities, optimize her activities of daily living, and improve her quality of life. (*Id.*)  Dr. Krishna diagnosed plaintiff with cervical and lumbar sprain injury, and recommended physical therapy, heat, electrical stimulation, exercise, and massages for pain management.  (Tr. 316, 318.)

### 15) 3/18/2016 Vocational Interrogatory Response by Marian Marracco, Vocational Expert

By way of interrogatory, the ALJ posed the following hypothetical to the vocational expert: (1) an individual possessing the same age, educational background, and past work experience as plaintiff; (2) limited to sedentary work, except that she could only occasionally climb ramps and stairs, balance and stoop, but never climb ladders and scaffolds, kneel, crouch,

and crawl; and (3) could perform simple and routine tasks in a low stress work environment involving only occasional judgment, decision-making, changes, and interaction with supervisors, coworkers, and the public. (Tr. 179-83, 192-93, 195-202, 204-05.) In response, the vocational expert testified that such an individual could perform a combined total of over 475,000 jobs in the national economy as a document preparer, electronic components taper, and machine feeder. (Tr. 198-99.)

## DISCUSSION

### I. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Asture*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *accord Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long

as they are supported by substantial evidence." *Genier v.*
*Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation
and internal quotation marks omitted.) Thus, "[i]f the
reviewing court finds substantial evidence to support the
Commissioner's final decision, that decision must be upheld,
even if substantial evidence supporting the plaintiff's position
also exists." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454
(S.D.N.Y. 2008) (citing *Alston v. Sullivan*, 904 F.2d 122, 126
(2d Cir. 1990)). "[I]t is up to the agency, and not [the]
court, to weigh the conflicting evidence in the record." *Clark*
*v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If
the court finds there is substantial evidence to support the
Commissioner's determination, the decision must be upheld, "even
if [the court] might justifiably have reached a different result
upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d
Cir. 1991) (internal citation omitted).

## II. LEGAL STANDARDS FOR DISABILITY DETERMINATION

"To receive federal disability benefits, an applicant
must be "disabled" within the meaning of the Social Security
Act." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). The
Social Security Act provides that the term "disability" means an
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has

31

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

"An individual may be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Regulations issued pursuant to the Social Security Act set forth a "five-step sequential evaluation" to determine whether a plaintiff is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (describing the five-step process). "If at any step, the ALJ finds that claimant is either disabled or not disabled, the inquiry ends" at that step. *Anderson v. Colvin*, No. 15-cv-6720, 2017 WL 1166350, at *6 (E.D.N.Y. Apr. 3, 2017). The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

At the first step, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If not, the Commissioner proceeds to the second step to determine whether the claimant has a "severe

medically determinable physical or mental impairment." *Id.* §
404.1520(a)(4)(ii). An impairment is considered severe if it
"significantly limits [claimant's] physical or mental ability to
do basic work activities." *Id.* § 404.1520(c). If the
impairment is severe, the ALJ proceeds to the third step, in
which the Commissioner determines whether the impairment meets
or equals one of the impairments listed in the Act's
regulations. *Id.* § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Part
404, Subpart P, App'x 1. If the claimant has one of the listed
impairments, then the ALJ will find that the claimant is
disabled under the Act. *Puccio v. Colvin*, No. 15-cv-06941, 2017
WL 1232488, at *3 (E.D.N.Y. Mar. 31, 2017) If the claimant does
not have a listed impairment, the ALJ must determine the
claimant's residual functional capacity ("RFC") before
continuing with steps four and five. *Id.*

An individual's RFC is "the most [a claimant] can
still do" in a work setting despite any physical and mental
limitations caused by the claimant's impairments and any related
symptoms. 20 C.F.R. § 404.1545(a)(1). At step four, the ALJ
uses the RFC determination to determine if the claimant can
perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the
claimant can still perform past relevant work, the claimant is
not disabled. If the claimant established that the impairments
prevent him from returning to his previous occupation, the ALJ

proceeds to step five, where the Commissioner must determine
whether the claimant, given the claimant's RFC, age, education,
and work experience, has the capacity to perform other
substantial gainful work in the national economy. 20 C.F.R. §
404.1520(a)(4)(v). If claimant can make an adjustment to other
work, the claimant is not disabled. *Id.*

### III. THE ALJ'S DECISION

On May 4, 2016, the ALJ issued a decision denying
plaintiff's claims. (Tr. 10-19.) At step one, the ALJ
concluded that plaintiff had not engaged in substantial gainful
activity since April 29, 2013, the application date. (Tr. 12.)
The court notes that plaintiff self-reported being able to
perform normally at work, on October 12, 2015. (Tr. 269, and p.
27, *supra*.)

At step two, the ALJ found that plaintiff had four
severe impairments: osteoarthritis; spine disorder; anxiety
disorders and affective disorders. (Tr. 12)

At step three, the ALJ found that plaintiff did not
have an impairment or combination of impairments that meets or
medically equaled the severity of the listed impairments in 20
CFR Part 404, Subpart P, App'x 1. (Tr. 12.) Specifically, the
ALJ found that no treating or examining physician had made
findings that are the same or equivalent in severity to the

criteria of any listed impairment, including listings 1.04
(compromised nerve root), 12.04, and 12.06. (Tr. 12.)

The ALJ next concluded that plaintiff has mild
restriction in activities of daily living. (Tr. 13.) She was
able to do activities of daily living on her own, but it
reportedly took her hours to dress, bathe, and groom herself.
(Tr. 13.) The ALJ next found that plaintiff has moderate
difficulties in social functioning, specifically with
interpersonal relationships, for which she has sought treatment.
(Tr. 13.) The ALJ further found that plaintiff has moderate
difficulties with regard to concentration, persistence, and
pace. (Tr. 13.) Because plaintiff has more than mild
impairments due to her symptoms, but the treatment records
indicate less than marked impairments, plaintiff's impairments
are considered moderate. (Tr. 13.) The ALJ concluded that
plaintiff's mental impairments do not cause at least "marked"
limitations or one "marked" limitation and "repeated" episodes
of decompensation. (Tr. 13.) Furthermore, the ALJ found that
plaintiff is able to function outside of a highly-supportive
living environment and has not had repeated episodes of
decompensation outside of her home. Plaintiff does not have a
residual disease process that such a marginal adjustment to even
a minimal increase in mental demands would cause her to
decompensate, according to the ALJ. (Tr. 13.)

The ALJ also found that plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR § 416.967(a) with the additional limitations that plaintiff can occasionally climb ramps and stairs but should never climb ladders and scaffolds, can occasionally balance and stoop, can never kneel, crouch and crawl. Plaintiff can work in a low stress environment defined as occasional judgment, occasional decision-making and occasional changes in work setting. (Tr. 14.)

At step four, the ALJ concluded that plaintiff had no past relevant work. (Tr. 18.)

At step five, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity to conclude that there are a significant number of jobs in the national economy which plaintiff can perform. (Tr. 18.) In making this determination, the ALJ relied on a vocational expert who testified plaintiff can perform the requirements of a Document Preparer (DOT #249.587-018), Taper (DOT #017.684-010), and Stringing Machine Tender (DOT #689.585-018) (Tr. 19.)[7]

In reaching this conclusion, the ALJ gave "some weight" to the opinions of Ranga Krishna. (Tr. 16.) The ALJ gave "great weight" to the opinions of consultative examiner Ashley Knoll,

---

[7] "DOT" refers to the "Dictionary of Occupational Titles," which is a publication produced by the United States Department of Labor that defines the various types of work, typically identified by their DOT numbers.

PhD. (Tr. 17.) The ALJ gave "great weight" to the opinion of consultative examiner Stephen Roberts, MD. (*Id.*) The ALJ gave "partial weight" to the opinions of Marlene Charles, MD. (*Id.*)

## IV. VOCATIONAL EXPERT'S INTERROGATORY

The ALJ additionally relied on the interrogatory responses of the vocational expert Marian Marracco to reach her determination of not disabled. (Tr. 185.) The ALJ requested a number of hypotheticals from Ms. Marracco. (Tr. 187, 196, 198.)

First, the ALJ requested an answer for the following hypothetical:

> 7. Assume a hypothetical individual who was born on April 15, 1980, and has work experience as described in your response to question #6 [describe work experience]. Assume further that this individual has the residual functional capacity (RFC) to perform at all exertional levels. The individual should work in a low stress environment defined as occasional judgment, occasional decision-making and occasional changes in work setting. They should be limited to simple, routine and repetitive tasks. They should have occasional interaction with supervisors, co-workers and the public.

> 10. Could the individual described in item #7 perform any unskilled occupations with jobs that exist in the national economy?

> (Tr. 187-88.)

Ms. Marracco identified three jobs that plaintiff could perform under these conditions: kitchen helper (DOT #318.687-010); night cleaner (DOT #323.687-014); and addresser (DOT #209.587-010). (Tr. 189.) Ms. Marracco also opined that

an employer would not tolerate more than 10% of an employee's cumulative time being off task at the unskilled level. (Tr. 190.) She further noted that more than two absences from work per month would not be tolerated. (Tr. 190.)

Next, the ALJ requested an answer from Mr. Marracco to the following hypothetical:

> 7. Assume a hypothetical individual who was born on April 15, 1980, has at least a high school education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response to question #6. Assume further that this individual has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except The individual can work at the light exertional level in that they can lift and or carry 20 lbs occasionally and 10 lbs frequently. They can sit for six hours in an eight-hour workday, stand and or walk for six hours in an eight-hour workday. The individual can occasionally climb ramps and stairs but should never climb ladders and scaffolds. They can occasionally balance and stoop. They should never kneel, crouch and crawl. The individual should work in a low stress environment defined as occasional use of judgment, occasional decision-making, and occasional changes in work setting. They can perform simple and routine tasks. They can have occasional interactions with supervisors, co-workers and the public.

> 10. Could the individual described in item #7 perform any unskilled occupations with jobs that exist in the national economy?

> (Tr. 196-97.)

Ms. Marracco identified three jobs plaintiff could perform under these conditions: bottling line attendant (DOT

#920.687-042); dispatcher-router (DOT #222.587-038); and mail

clerk (DOT #209.687-026). (Tr. 197.)

The ALJ then requested an answer to the third

hypothetical from Ms. Marracco:

> 12. Assume a hypothetical individual who was born on April 15, 1980, has at least a high school education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response to question #6. Assume further that this individual has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b) except the individual can work at the sedentary exertional level in that they can lift and or carry 10 lbs occasionally. They can sit for six hours in an eight-hour workday, stand and or walk for two hours in an eight-hour workday. The individual can occasionally climb ramps and stairs but should never climb ladders and scaffolds. They can occasionally balance and stoop. They should never kneel, crouch and crawl. The individual should work in a low stress environment defined as occasional use of judgment, occasional decision-making, and occasional changes in work setting. They can perform simple and routine tasks. They can have occasional interactions with supervisors, co-workers and the public.
>
> 15. Could the individual described in item #12 perform any unskilled occupations with jobs that exist in the national economy?
>
> (Tr. 198-99.)

Ms. Marracco then identified three jobs plaintiff

could perform under these conditions: document preparer (DOT

#249.587-018); taper of electronic components (DOT #017.684-

010); and machine tender / feeder (DOT #689.585-018). (Tr.

199.)

## V. ANALYSIS

Plaintiff appeals the Commissioner's decision based on two issues. (Pl. Mem. at 8.) First, she asserts that the ALJ improperly weighed the medical evidence, specifically by assigning significant weight to Dr. Roberts' opinion and not assigning controlling weight to Dr. Krishna, who is plaintiff's treating physician. (*Id.* at 13.) Next, plaintiff asserts Dr. Knoll's findings, in regard to her psychological impairments, are given too much weight as they are based off a single examination. (*Id.* at 14-15.) She further maintains that, even if Dr. Knoll's opinions had properly been assigned significant evidentiary weight, they do not support the ALJ's finding that she is not disabled. (*Id.*) Thus, plaintiff requests that the court vacate and reverse the ALJ's decision and the matter should be remanded for the sole purpose of calculating benefits, or, in the alternative, for further administrative proceedings, including a new hearing. (*Id.* at 15-16.)

In contrast, the defendant asserts that the ALJ reasonably gave weight to Dr. Roberts' opinion because it was consistent with the medical record. (Def. Mem. at 18.) Defendant further argues that Dr. Knoll's opinion was given proper weight and that it supports the ALJ's RFC. (*Id.* at 21.) For the reasons stated below, defendant's motion is denied; plaintiff's motion is denied in part and granted in part; and

this case is remanded for further administrative proceedings consistent with this Memorandum and Order.

## A. The Treating Physician Rule

An ALJ may consider various types of evidence, including medical opinions. *See* 20 C.F.R. § 404.1527(b). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant' can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Id.* § 404.1527(a)(1). Generally, when weighing medical opinions, the ALJ should consider following factors: examining relationship; length, nature, and extent of the treating relationship; supportability, including clinical signs and findings; consistency with the record as a whole; and specialization. *Id.* §§ 202.1527(c), 404.1527(c).

A treating physician's opinion is entitled to controlling weight if his or her opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Id.* § 404.1527(c)(2). Under the "treating physician rule," the opinions of a claimant's "treating physician" are entitled to a degree of deference, and the ALJ is required either to give "controlling weight" to such

41

opinions or to provide good reasons for discounting them. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (explaining the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion").

An "ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion," including: "(i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA]'s attention that tend to support or contradict the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Plaintiff argues that the ALJ erred in denying Dr. Krishna's opinion controlling weight. (Pl. Mem. 13.) The court agrees as it finds that the ALJ did not comply with the proper legal standards when departing from the treating physician rule.

The ALJ only accorded "some weight," rather than "controlling weight," to plaintiff's treating physician, Dr. Krishna, who opined, among other things, that plaintiff "cannot sit, stand, or walk more than a few minutes at a time, nor can she lift more than 5 pounds" due to multiple herniated cervical

discs.  (*Id.; see also* Tr. 16-17.)  In support of granting "some weight" to Dr. Krishna, the ALJ explained the examination of plaintiff was more restrictive than plaintiff suggested during her visits to USA Pain Center.  (Tr. 16-17.)

Although ALJs are not required to recite every single factor in considering how much weight to accord a treating physician, the ALJ's explanation addresses only one of the seven factors which she is required to address - the factor of consistency.  The ALJ should consider the length, nature, and extent of the treatment relationship.  The ALJ should further consider the evidence in support of the treating physician's opinion, the consistency of the opinion with the record as a whole, and whether the opinion is from a specialist.

Here, the ALJ found that the opinions of plaintiff's treating physician should be given "some weight," but less than the findings of Dr. Roberts, whose findings were accorded "great weight."  (Tr. 17-18.)  The ALJ did not address the necessary factors when giving Dr. Roberts' findings more weight than Dr. Krishna.  Importantly, the ALJ failed to address the fact that Dr. Krishna's opinion is supported by objective medical evidence in the form of MRIs which show multiple disc herniations causing compression or indentation of the thecal sac.

Aside from the fact that the ALJ has violated the "treating physician rule," she has also violated the

corresponding "good cause" rule. Failure "to provide good reasons for not crediting the opinion of a plaintiff's treating physician is ground for remand." *Sanders v. Comm's of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir.); *see also Halloran*, 362 F.3d at 32-33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion."). Here, the ALJ has provided limited explanation as to why she allocated "some weight" to Dr. Krishna's opinion. She has articulated only one reason – that the opinion is not entirely consistent with a statement that plaintiff made on a single occasion. The court finds that this single inconsistency does not constitute "good reasons," and this case must be remanded for a more comprehensive analysis or explanation of the ALJ's rejection of the treating physician's findings.

The defendant argues that the ALJ's decision is supported by substantial evidence. (Def. Mem. at 20.) However, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (citation and internal quotation marks

omitted). The above-identified deficits in the ALJ's reasoning do not require that the court address defendant's argument that the ALJ's decision is supported by substantial evidence.

### B. Plaintiff's Mental Residual Functional Capacity Finding

Plaintiff next argues that the ALJ violated the "treating physician rule" by giving "great weight" to the opinion of Dr. Ashley Knoll, who concluded that plaintiff has mild limitations in her ability to maintain attention, moderate limitations in her ability to maintain a regular schedule, and marked limitations in relating adequately to others and dealing with stress. (Tr. 17.) Plaintiff also asserts that, even if Dr. Knoll's opinions had rightfully been accorded great weight, her opinions do not support a finding that plaintiff is capable of employment. (Pl. Mem. 15.)

The court finds that Dr. Knoll's opinion does not support the ALJ's RFC determination. The ALJ appears to have ignored relevant comments from Dr. Knoll's opinion, which she relied upon in finding plaintiff capable of regular employment. Specifically, Dr. Knoll's report states that plaintiff is unable to leave her apartment due to depressed mood and anxiety, is unable to drive or take public transportation, and is socially withdrawn. (Tr. 250.) Dr. Knoll opined that plaintiff had a marked impairment in relating adequately with others and in

dealing with stress. (*Id.*) Dr. Knoll concluded that plaintiff's psychiatric problems may "significantly interfere with [her] ability to function on a daily basis." (*Id.*)

By contrast, the ALJ determined that plaintiff had "moderate" limitations in her social functioning. (Tr. 13.) The ALJ's finding of moderate limitations conflicts with Dr. Knoll's finding that plaintiff's limitations in social functioning are "marked." Moreover, the ALJ accorded Dr. Knoll's opinions "great weight." (Tr. 13, 250.) At no point in the ALJ's decision did the ALJ address that inconsistency or explain her reasoning for finding "moderate" limitations when Dr. Knoll clearly indicated that the limitations were more than moderate.

It is error for an ALJ to create an RFC that conflicts with portions of a medical source statement that was accorded great weight without explaining the inconsistency. *Dioguardi v Commissioner*, 445 F. Supp.2d 288, 297 (W.D.N.Y. 2006); and *Peterson v. Astrue* 2 F.Supp.3d 223, 234-35 (N.D.N.Y. 2012). "The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of non-disability." *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). "Cherry picking" can indicate a serious misreading of evidence, a failure to comply with the requirement

that all evidence be taken into account, or both. *Genier v. Astrue,* 606 F.3d 46, 50 (2d Cir.2010).

Thus, the court finds that that inconsistency must be explained on remand. The court respectfully directs that the ALJ re-consider plaintiff's mental limitations in light of the findings of Dr. Charles and Dr. Knoll.

### C. The ALJ's decision was not supported by substantial evidence

The defendant argues that the ALJ's decision is supported by substantial evidence. However, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Meadors v. Astrue,* 370 F. App'x 179, 184 (2d Cir. 2010) (citation and internal quotation marks omitted). "The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence." *Davis v. Colvin,* 14-CV-111V(F), 2016 WL 11264712, at *5 (W.D.N.Y. Aug. 30, 2016).

In order to be classified as depressive, a plaintiff must show evidence of at least five factors enumerated in

Listing 12.04(A)(1), and either an extreme limitation in one area, or a marked limitation in two areas enumerated in Listing 12.04(B). 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04. In order to be classified as having an anxiety disorder, a plaintiff must show evidence of at least three factors enumerated in Listing 12.06(A)(1) and either an extreme limitation in one area, or a marked limitation in two areas enumerated in Listing 12.06(B). 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.06. The four areas of mental impairment are the same in both sections, referencing the ability to: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt of manage oneself. *Id.*

Listing 12.04(A)(1) is satisfied if a plaintiff displays at least five of these symptoms: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(A)(1). Although controlling weight should have been given to the opinion of plaintiff's treating physician, Dr. Krishna, the ALJ gave great weight to the opinion of Dr. Ashley Knoll. (Tr. 17.) Even if Dr. Knoll's opinion were controlling,

however, the evidence does not support the findings of the ALJ. Dr. Knoll found plaintiff to have a depressed mood; appetite disturbance; difficulty sleeping; fatigue; and forgetfulness, thus satisfying the five-factor requirement of Listing 12.04(A)(1). 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(A)(1); (Tr. 248.)

Further, Dr. Knoll noted that plaintiff had marked limitations in two areas: "relating adequately with others" and "appropriately dealing with stress." (Tr. 250.) In addition, Dr. Charles, whose opinion was given partial weight, noted plaintiff had marked limitations in the ability to understand and carry out instructions; the ability to maintain concentration and attention; the ability to maintain a schedule; the ability to set realistic goals; and the ability to tolerate normal levels of stress. (Tr. 17, 265-266.)

Both Dr. Knoll and Dr. Charles noted more than one marked limitation that falls within the scope of the four Listing 12.04(B) areas. First, Listing 12.04(B)(2), the ability to "interact with others," directly corresponds to Dr. Knoll's finding of a marked limitation in "relating adequately with others." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(B)(2); (Tr. 250.) Nevertheless, the ALJ characterized plaintiff's limitation in this area as "moderate." (Tr. 13.)

Second, Listing 12.04(B)(3), the ability to "concentrate, persist, or maintain pace" includes the ability to "sustain[] an ordinary routine and regular attendance at work." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(B)(3); 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(E)(3). Dr. Charles noted marked limitations in maintaining concentration, attention, and a schedule, corresponding with Listing 12.04(B)(3). (Tr. 265-266.) The ALJ characterized plaintiff's impairment in this area as "moderate," despite Dr. Charles' medical finding of a "marked" impairment. (Tr. 13; 265-266.)

Third, Listing 12.04(B)(4), the ability to "adapt or manage oneself,"[8] corresponds to Dr. Knoll's finding that plaintiff had a marked limitation in "appropriately dealing with stress." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(B)(2). The medical opinion evidence reflects that plaintiff has marked limitations in at least three of the four areas of Listing 12.04(B). For the same reasons, plaintiff also likely satisfies the requirements of Listing 12.06, as plaintiff has a well-documented anxiety disorder that includes symptoms of fatigue,

---

[8] "Adapt or manage oneself" is defined as the "area of mental functioning refer[ring] to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." 20 C.F.R. Part 404, Subpart P, App'x 1, §12.00(E)(2).

difficulty concentrating, and sleep disturbance, along with the above-mentioned marked limitations in adapting or managing herself, maintaining concentration, attention, and a schedule, and ability to interact with others. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.06; (Tr. 209, 217, 241. 247, 248.)

Because the ALJ's findings are not supported by substantial evidence that plaintiff has only one marked impairment, the court must remand. *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Asture*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). Pursuant to the five-step sequential evaluation process used by courts within this circuit, if at any step, the ALJ finds that plaintiff is either disabled or not disabled, the inquiry ends at that step. Thus, the court remands the case for further findings relating to whether plaintiff is disabled due to her meeting the requirements enumerated in the relevant listings, per step three. 20 C.F.R. § 404.1520(a)(4); *see also Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (describing the five-step process).

## CONCLUSION

For the reasons set forth above, the court denies the Commissioner's motion for judgment on the pleadings, and grants plaintiff's cross-motion to the extent she seeks remand of her action for further proceedings consistent with this Memorandum

and Order.  The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:     February 12, 2020
           Brooklyn, New York


                                    _____/s/_____
                                    **HON. KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York